## Mastran v. Marks
*[Cite as 2 AOA 473]*

*Case No. 14270*
*Summit County, (9th)*
*Decided March 28, 1990*

*R.C. 2305.11*

Charles E. Dunlap, Attorney at Law, 700 Wick Bldg., 34 Federal Plaza West, Youngstown, OH 44503 for Plaintiffs.

Orville L. Reed, III, Attorney at Law, 50 S. Main St., PO. Box 1500, Akron, OH 44309 for Defendant.

BAIRD, J.

This cause comes before the court upon the appeal of Henry R. Mastran and Patricia Mastran from the August 23, 1989, order of the Summit County Court of Common Pleas granting summary judgment to Donald L. Marks, in their suit against Marks for legal malpractice and breach of fiduciary duty.

Attorney Marks had represented the Mastrans in a foreclosure action filed against them by National City Bank in December of 1984. The bank was successful in this action, and the subject property was sold at a sheriff's auction. In their complaint filed on September 17, 1986, the Mastrans alleged that Marks negligently failed to file an objection to the sheriff's appraisal of the property, which resulted in the property being sold at too low a price, and a $40,000 deficiency judgment being rendered against the Mastrans. They further alleged breach of fiduciary duty in that Marks acquired an interest in the property through the sheriff's sale.

Marks filed a motion for summary judgment, alleging that the Mastrans suffered no pecuniary loss, and that the claim was barred by the applicable one-year statute of limitations, R.C. 2305.11(A). The trial court granted summary judgment on the ground that the Mastrans suffered no pecuniary loss, but did not address the issue of the statute of limitations. Upon appeal, this court reversed and the cause was remanded. *Mastran* v. *Marks*, Summit App. No. 13486, July 6, 1988, unreported.

Upon remand, Marks filed another motion for summary judgment on the issue of the statute of limitations. The trial court again granted the motion, finding that the action had been commenced beyond the one-year limitation period imposed for such claims by R.C. 2305.11(A).

### ASSIGNMENT OF ERROR

"The trial court erred in granting defendant's motion for summary judgment and in holding that plaintiffs' complaint for legal malpractice is barred by the one year statute of limitations, set forth in Ohio Revised Code Section 2305.11(A), because there is a genuine issue of fact both as to when the attorney-client relationship terminated, as to when plaintiffs discovered that their injury was related to their attorney's act or non-act."

Summary judgment may be properly granted only where:

"(1) No genuine issue as to any material fact remains to be litigated ; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party." Civ. R. 56(C); *Temple* v. *Wean United* (1977), 50 Ohio St. 2d 317, 327.

The Supreme Court of Ohio has established a two-prong test for determining when the statute of limitations begins to run on a claim for legal malpractice:

"Under R.C. 2305.11(A), an action for legal malpractice accrues and the statute of limitations begins to run when there is a cognizable event whereby the client discovers or should have discovered that his injury was related to his attorney's act or non-act and the client is put on notice of a need to pursue his possible remedies against the attorney or when the attorney-client relationship for that particular transaction or undertaking terminates, whichever occurs later. ***." *Zimmie* v. *Calfee, Halter & Griswold* (1989), 43 Ohio St. 3d 54, syllabus.

The trial court determined that both the discovery of the injury and the termination of

the attorney-client relationship occurred as the result of a telephone conversation between Mr. Mastran and attorney Marks on September 9, 1985, and that therefore the claims were barred due to untimely filing on September 20, 1986. The gist of that conversation and its aftermath were recounted by Mr. Mastran in his deposition:

"***.

"A. Mr. Marks called me one morning. I was in the trailer. I was working as an inspector for Roadway Industries, and he called me and he said, 'Well, your building went for 77,000.'

"I says, 'What do you mean it went for 77,000?'

"He says, 'I sent a man down there and I sent some money with him.'

"And I says, 'What does that mean?'

"I says, 'That means you own part of my building.'

"And he says, 'Well, I guess you could say that.'

"I said, 'Don, there is something wrong here.'

"I said, 'There is a conflict of interest. How could you end up with my building? You're saving me money?'

"He said, 'I'm saving you money, 17.'

"I said, How are you saving me 17,000? In fact, you're costing me 40,000.'

"I said, 'There is something wrong here.'

"***.

"Q. Now, at that point I take it you were fairly upset with Mr. Marks?

"A. Absolutely. I told him, I says, 'Don, I don't know what I am going to do but I am going to hang up. I am going to do something.'

"Q. And at that point you totally lost confidence in Mr. Marks?

"A. Yes.

"Q. And at that point he was no longer your attorney?

"A. No, he was until I sent him a letter, until I got another attorney by the name of Axner, and I did what Axner told me to do, and then I wrote a letter and I dismissed Mr. Marks from all cases that he had for me, but that was only in writing as per attorneys.

"***.

"Q. Did Mr. Marks get in touch with you immediately after the sheriff's sale to let you know that the property had been sold?

"A. He called me.

"Q. And at that point you learned --

"A. That he owned the building?

"Q. --- that he owned the building?

"A. Yes.

"Q. And you were upset about that?

"A. Yes.

"Q. At that point you intended to discharge him because you thought there was something wrong?

"A. No.

"Q. You did not intended to discharge him?

"A. No, I didn't know what I was going to do. I said, 'Don, I am going to hang up on you.'

"I said, 'This doesn't feel right. This feels like a conflict of interest and I am just barred (sic) by the fact that you own my building and you're my attorney, and I'm going to do something. I don't know what, and I am going to hang up.' And I hung up and that was the last time.

"Q. Was that the last time you talked to him?

"A. No, as I remember, no. When I delivered the letter I talked to him.

"Q. Did you go immediately shortly (sic) thereafter to Attorney Axner's office?

"A. I was up most of the night to call friends to recommend an attorney, and I was up most of the time. I had to go the doctor and get blood pressure medicine. My blood pressure went up and then my wife's blood pressure went up, and we just had a hell of a time. And finally I got a name of Axner, and I called him. It took a couple days to get to him, and so that's how we started getting - -I just didn't want to go without any more legal counsel, that's all.

"Q. And when you went to Axner's office, had you made the determination at that time that you were going to discharge Attorney Marks?

"A. Yes. He told me to write a letter as soon as possible and we will resolve the other points later on, and 'I will write it and I will deliver it.' So that's what I did.

"Q. When in your own mind were you convinced that Mr. Marks did something wrong to you?

"A. When he told me he owned my building.

"Q. That very day?

"A. Yes. In retrospect I couldn't understand a lot of things. In retrospect that very day, the very day he told me, I lost confidence in him. I just lost everything. I was just sick.

"Q. At that the point when you lost confidence in Mr. Marks, would you have referred any further legal matters to him?

"A. No, I couldn't."

"***."

We find no error in the trial court's ruling on the dis-covery issue, as the facts are clear that Mr. Mastran became aware during the phone conversation of the fact of the injury and of the need to pursue a legal remedy. The Mastrans cite *McKee* v. *Williams* (1985), 23 Ohio App. 3d 187, for the proposition that what must be discovered is a "legal injury", and argue that Mr. Mastran could not have discovered this until, through consultation with another attorney on September 20, 1985, he became aware of the legal nature of the injury and the fact that there was a legal remedy available.

We decline to restrict the discovery of a legal injury as narrowly as the appellants would have it, to the time when the injured party consults an attorney and is advised of the specific legal nature of his injury and its possible remedies. To do so would effectively vitiate the statute of limitations, as it would allow a party to delay unnecessarily in consulting an attorney to "discover" his legal injury, and thus to pursue a claim several years after the fact.

The trial court's finding that there was no genuine issue of material fact as to when the attorney-client relationship terminated, however, is not supported by clear, indisputable facts in the record. The trial court cited the fact that Mr. Mastran admitted that he lost confidence in attorney Marks as a result of the phone conversation, and then cited *Brown* v. *Johnstone* (1982), 5 Ohio App. 3d 165, where this court held that, for purposes of the application of the statute of limitations in an action for legal malpractice, "conduct which dissolves the essential mutual confidence between attorney and client signals the termination of the attorney-client relationship." A careful reading of this case, however, shows that the termination of the attorney-client relationship depends, not on a subjective loss of confidence on the part of the client, but on *conduct*, an affirmative act by either the attorney or the client that signals the end of the relationship. For a trial court to grant summary judgment on this basis, such an act must be clear and unambiguous, so that reasonable minds can come to but one conclusion from it. Where an act can be reasonably viewed as other than a clear, unambiguous signal that the attorney-client relationship is at an end, summary judgment is improper.

When the facts are looked at in the light most favorable to the Mastrans, as required by Civ. R. 56(C), it is evident that a jury could reasonably conclude that Mr. Mastran's loss of confidence led him to seek other legal advice in order to determine whether to sever the attorney-client relationship, and that Mr. Mastran made no affirmative act to do so until the delivery of the letter of termination on September 20, 1985. The record further shows that attorney Marks continued to act without apparent objection as the Mastrans' attorney after the phone conversation, by preparing and filing documents concerning the sale of the property on September 12, 1985. The parties had no further significant contact until the termination letter was delivered on September 20, 1985. Though it is not necessary that a formal communication of termination be made for termination to occur, *Brown* v. *Johnstone, supra,* at 166-67, this would not preclude a jury from reasonably finding that, in this case, termination did not occur until the letter of termination was delivered. Finally, the fact that Mr. Mastran stated that he would not have referred other legal matters to attorney Marks after the phone conversation is immaterial, for it is the termination of the "attorney-client relationship for that particular transaction or undertaking" that is of key consideration. *Zimmie* v.*Calfee, Halter & Griswold, supra.*

As there is a genuine issue of material fact as to when the attorney-client relationship terminated in this case, the trial court erred in granting summary judgment for the defendant. On this basis, appellants' assignment of error is well taken. Judgment reversed and remanded for further proceedings consistent with this opinion and the law.

*Judgment reversed, and cause remanded.*

CIRIGLIANO, J.
Concurs
QUILLIN, P. J.
Not participating